UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
COVINGTON

| | | |
|---|---|---|
| DONNA OEHLER, | ) | |
| | ) | |
| Plaintiff, | ) | No. 2:21-CV-135-REW-CJS |
| | ) | |
| v. | ) | |
| | ) | OPINION AND ORDER |
| ECLIPSE SENIOR LIVING, INC., | ) | |
| | ) | |
| Defendant. | ) | |

*** *** *** ***

Plaintiff Donna Oehler served as Executive Director of Elmcroft at Florence, an assisted living community operated by Defendant Eclipse Senior Living, Inc. Eclipse terminated Oehler's employment in July 2021 after a contested investigation of elder abuse in Elmcroft and a dispute between Oehler and Eclipse management concerning the home's COVID-19 screening policies. She then filed this suit seeking damages for wrongful termination, age discrimination, and retaliation. Following discovery, Eclipse moved for summary judgment on each claim, *see* DE 43 (Motion), and Oehler moved for leave to attach certain exhibits to her response in opposition, *see* DE 50. Both motions are fully briefed and ripe for review. For the following reasons, the Court **GRANTS** Eclipse's motion for summary judgment in part and **DENIES** the motion in part and **GRANTS** Oehler's motion for leave as to Exhibit 10 and **DENIES it as MOOT** as to Exhibit 12.

I.   **Background**

a.  **Facts**

On December 28, 2011, Plaintiff Donna Oehler began working at Elmcroft of Florence (Elmcroft), an assisted-living community, as the Community Relations Director. *See* DE 12 (Amended Complaint) at ¶ 9; DE 43 (Memo in Support) at 1. At the time, Elmcroft was managed

1

by another third-party company. *See* DE 60 (Response) at 2. Defendant Eclipse Senior Living, Inc. (Eclipse) began operating and managing Elmcroft in March 2018. *See* DE 43 at 1–2. Eclipse was "a national manager of senior assisted living facilities[.]" *See* DE 12 at ¶ 10.[1] In August 2018, Eclipse promoted Oehler to Executive Director of Elmcroft. *See id.* at ¶ 12. She was sixty-one (61) years old at the time. *See* DE 43 at 2. In this role, Oehler "held responsibility for planning and implementing all aspects of community operations, including assuring the healthiest possible residents, providing good documentation in associate files, maintaining confidentiality of all pertinent personal or health information, and conducting safety walks and other initiatives to support health, residents, and associates." *See id.* (quoting DE 43-5 (Job Description)) (internal quotation marks and alterations omitted). Elmcroft residents were considered a "vulnerable" population due to their age and ailments. *See id.* (quoting DE 43-3 (Oehler Depo Excerpts)).

Throughout her tenure, Oehler's annual reviews "generally reflected satisfactory performance." *See id.* However, just prior to Eclipse beginning operations at Elmcroft, Oehler's previous supervisor, Regional Director of Operations Wendy Shoemaker, placed Oehler on a performance improvement plan (PIP). *See id.* at 2–3; *see also* DE 43-7 (Performance Improvement Plan Excerpt). Oehler disagreed with the PIP and wrote a rebuttal. *See* DE 60 (Response) at 2. Nevertheless, the PIP called for improvements in proper documentation, consistent application of policies and procedures, and avoiding favoritism. *See* DE 43 (Memo in Support) at 2–3. This PIP, however, appears to have had little bearing on Oehler's termination. According to Eclipse: "The relevant misconduct leading to Ms. Oehler's termination all occurred following her last annual review. During those several months, Ms. Oehler demonstrated unsatisfactory performance,

---

[1] On October 26, 2021, Elmcroft of Florence was sold to another third-party management company and became Inspirations of Florence. Eclipse terminated all its Florence, Kentucky employees before the end of the year. Per a Certificate of Dissolution filed on April 26, 2022, Eclipse ceased all operations nationally, retaining only a Chief Winddown Officer, who remained to assist with the winddown process. *See* DE 43 (Memo in Support) at 7.

making several dangerous decisions that placed the health and safety of the community's residents and associates at risk and, thus, resulting in her termination from employment." *See id*. at 3.

The central chain of events occurred during July 2021. While, or just after, Oehler was away from Elmcroft on a previously scheduled vacation, incidents of suspected elder abuse occurred in the home's memory care unit. *See* DE 12 (Amended Complaint) at ¶ 19. Unit staff "redirected residents by spraying them with squirt guns and, in one instance, by tossing a glass of water on a resident." *See* DE 43 (Memo in Support) at 4. Oehler learned about the incidents on July 13, after her return to Elmcroft. *See* DE 12 (Amended Complaint) at ¶ 21. She immediately suspended Memory Care Director Koreana Manley—one of the confirmed perpetrators of the elder abuse—but was told by Regional Operations Director Shay Lingerfelt (who replaced Shoemaker) to "hold off" on reporting the incident to the state's Adult Protective Services (APS) pending an internal investigation. *See id*. at ¶ 21; DE 52 (Oehler Depo) at 26. Lingerfelt happened to be on site that day, but Oehler did not learn of the incidents or confer with Lingerfelt until he had left the site. *See* DE 52 (Oehler Depo) at 152. Oehler requested to terminate Manley, which HR Director Kari Vaughn opposed because Manley had not first been placed on a PIP. *See* DE 12 (Amended Complaint) at ¶¶ 22–23. Earlier that year, Oehler previously requested permission from Eclipse management to terminate Manley after providing a timeline of performance, quality of care, and resident safety issues. *See* DE 60 (Response) at 5–6. Vaughn did not respond to or approve Oehler's request prior to the July 2021 abuse. *See* DE 12 (Amended Complaint) at ¶¶ 16–18. According to Eclipse, Manley had previously complained that Oehler was targeting her. *See* DE 43 (Memo in Support) at 5 n.1.

On July 14, 2021, Eclipse—through Oehler—began internally investigating the elder abuse incidents. On that day, Eclipse also formally agreed with Oehler's recommendation to suspend

Manley. *See id.* at 5. On July 16, after Oehler and her staff completed the initial investigation and incident report, Eclipse approved Oehler's request to report the incident to the Boone County Police Department (BCPD) and APS, as required by KRS 216B.165 and 209.030. *See* DE 12 (Amended Complaint) at ¶ 25; DE 43 (Memo in Support) at 5. In the three days between the initial reports of elder abuse and Eclipse's report to authorities, Oehler persistently requested that Eclipse management allow her to file an elder abuse report, believing that Kentucky law required that she immediately report the incident rather than wait for the internal investigation's completion. *See* DE 52 (Oehler Depo) at 27–28, 47 (referencing "finally" getting permission), 85 ("I was very firm. . .. I was very firm on circling back and saying the police needed to be called."); DE 53-6 (Oehler Email) at 1–2. She did not file the report before receiving permission to do so on July 16.

A few days later, on July 19, Oehler "reported to work, despite having symptoms of COVID-19." *See* DE 43 (Memo in Support) at 5. Oehler admits that she was not feeling well, but says she took her temperature, was not running a fever, and gave herself a COVID test—after reporting to work—which was negative. *See* DE 12 (Amended Complaint) at ¶ 27. During a conference call that day, Oehler referenced her illness in a discussion with Lingerfelt, who then asked if Oehler had passed the COVID-19 screening that day upon her arrival. *See id.* In response to the COVID-19 pandemic, Eclipse implemented two policies to protect residents and employees from the disease. *See* DE 43 (Memo in Support) at 3–4. First, Eclipse began weekly testing of staff and residents using CDC approved PCR tests to ensure that those within the facility did not contract the virus during the previous week. *Id.*; DE 60 (Response) at 3. Second, Eclipse implemented a screening system called Go Canvas, which used a series of questions and inputs to screen for risk any person seeking admittance into the facility, including staff. *Id.*; DE 43 (Memo in Support) at 3–4. Go Canvas flagged potential infection risks based on the questions answered by each

participant and allowed administrators, like Oehler, to review and evaluate the data generated to tailor their prevention approach. *See* DE 43-3 (Oehler Depo) at 16. Regardless of vaccination status, Eclipse (at least, during the effective period) required all residents, associates, visitors, and healthcare personnel to complete Go Canvas screening each time they entered Elmcroft. *See* DE 43 (Memo in Support) at 3.

In response to Lingerfelt's inquiry over whether Oehler passed the Go Canvas screening that morning, Oehler explained that she had suspended Go Canvas entry screenings and weekly testing in mid-May in response to written correspondence received from Eclipse. *See* DE 12 (Amended Complaint) at ¶ 28. The correspondence stated: "We are no longer conducting proactive screening testing for communities in counties with >10% positivity test rates unless it remains a requirement by the state or local public health departments." *See* DE 43 (Memo in Support) at 4; DE 43-15 (Lingerfelt Email) at 1. Oehler interpreted the communication to mean that all COVID testing and screening procedures were no longer necessary, since COVID rates in Elmcroft's locale remained below the 10% threshold. *See* DE 43-3 (Oehler Depo) at 17 (stating that she understood the email as referring to "both testing and screening"). According to Eclipse, the update referred only to the weekly COVID testing, not the daily Go Canvas screenings, which should still have been active. *See* DE 43 (Memo in Support) at 4. Lingerfelt informed Oehler that she misinterpreted Eclipse's Vaccination Update and forwarded the correspondence with Oehler up the chain of command. *See id.* at 6.

That all occurred on July 19.  Lingerfelt had visited Elmcroft in the normal course on July 13.  Because Oehler had months prior lifted the Go Canvas screening, Lingerfelt faced no screening on the day in question.  Further, he made no comment to Oehler about the lack of screening.  *See* DE 60-1 (Oehler Aff.) at ¶¶ 5–6 (confirming no screening since May 2021 and that

Lingerfelt did not remark on lack of screening on July 13); DE 53 (Lingerfelt Depo) at 54 (conceding that if he entered without screening and thought he should have been screened he "would have said something to her about it"). He raised no issue with Oehler about the lack of screening that day. *Id.* Although the abuse allegations surfaced later that day, Oehler did not learn of them until Lingerfelt had already left; she spoke to him about the allegations by phone when Lingerfelt was at the airport to depart. *See* DE 52 (Oehler Depo) at 152 ("I called him immediately. He was still at the airport . . .. He had spent all day with me.").

Later that week, a family member of one of the victims of the July elder abuse incident contacted Elmcroft and requested a meeting to discuss the allegations. Oehler met with the family member in person on July 22, and Lingerfelt joined the meeting remotely by video. *See* DE 61-1 (Email Exchange). During the meeting, the family member requested an internal investigation report, as to an earlier incident, prepared by Oehler and her staff. *Id.* Oehler recognized that such reports are normally kept confidential and internal unless an executive-level employee grants permission to disclose them. *Id.* However, Oehler understood that at the meeting, Lingerfelt offered such permission, and she later forwarded the report to the family member. *Id.* Lingerfelt later denied granting her permission and maintained that the report should have remained internal and confidential. *Id.* In the exchange, Oehler recognized that she had never forwarded such a report to an outside source and needed permission to do so. *Id.*

On July 25, Eclipse suspended Oehler after a meeting with Lingerfelt. *See* DE 52 (Oehler Depo) at 184. After a subsequent meeting with Oehler on July 27, Lingerfelt terminated Oehler's employment on July 28. *See* DE 43 at 7.  Lingerfelt initially assumed Oehler's responsibilities at Elmcroft while Eclipse searched for her replacement. *See* DE 43-22 (Lingerfelt Letter). Lingerfelt estimated that the process would take around 6–8 weeks under Eclipse's normal hiring procedure

and explained that Eclipse's HR and recruitment staff would oversee the hiring process. *Id.* Six weeks later, Eclipse hired Kristine Hehn as Elmcroft's new Executive Director. *See* DE 43-23 (Lingerfelt Letter). When hired, Hehn brought Eclipse over 25 years of experience in care service coordination, memory care management, and senior living services. *Id.* The record does not establish her age; Lingerfelt estimated in his deposition that she was in her early 50's when hired. *See* DE 53 (Lingerfelt Depo) at 102 ("Guessing, early 50s maybe" when asked Hehn's age). Oehler was sixty-four (64) years old when Eclipse terminated her employment. *See* DE 12 (Amended Complaint) at ¶ 8.

### b. Procedural History

Oehler filed this action against Eclipse on October 29, 2021. *See* DE 1 (Complaint). Oehler later amended her complaint. *See* DE 12 (Amended Complaint). The Amended Complaint asserts three causes of action: (1) Wrongful Termination in violation of Kentucky Public Policy; (2) Age Discrimination in violation of the Kentucky Civil Rights Act (KRS 344.040); and (3) Retaliation in violation of KRS 446.070. *See generally* DE 12 (Amended Complaint). Oehler alleges Eclipse retaliated against and terminated her for protected activity relative to the abuse instances, including Oehler's internal reporting, her insistence on external reporting, her pushback against delay of an immediate report, and the reports she ultimately made to authorities. *See id.* She also alleges age discrimination. *See* DE 12 (Amended Complaint) at ¶ 36.

Following discovery, Eclipse moved for summary judgment on all three of Oehler's claims. *See* DE 43 (Memo in Support). Oehler responded in opposition, *see* DE 60, and Eclipse replied, *see* DE 65. In connection with her response, Oehler filed a motion for leave to file, as responsive exhibits, Plaintiff's Exhibits 10 and 12 to the Deposition of Shay Lingerfelt, as further support her opposition. *See* DE 50 (Motion for Leave to File). The Court previously struck Exhibit 10 from

the record after Eclipse inadvertently attached the document to its summary judgment motion. *See* DE 47 (Order). Eclipse responded in opposition to Oehler's motion, *see* DE 64, and Oehler replied, *see* DE 67. During the pendency of Oehler's motion for leave, she filed an unredacted version of her response to Eclipse's summary judgment motion, along with the exhibits themselves, under seal. *See* DE 61 (Sealed Documents). As Oehler's motion is related to Eclipse's summary judgment motion, the Court resolves both in this decision.

## II.   Discussion

### a.   Oehler's Motion for Leave

Oehler moves to file Plaintiff's Exhibits 10 and 12 to the Deposition of Shay Lingerfelt as part of the evidentiary materials opposing Eclipse's motion for summary judgment. *See* DE 50. Both exhibits are internal email communications involving Eclipse staff members, including Lingerfelt and Oehler, and, in part, counsel. The crux of Oehler's argument is that Exhibit 10 is not subject to lawyer-client privilege and, if it is, Eclipse waived the privilege. *See id.* Oehler similarly argues that the privilege (if any) for Exhibit 12 was also waived. *See id.* While the parties narrow their sights on waiver, the Court stops short of that issue because Exhibit 10 is not protected by lawyer-client privilege, and the motion to file Exhibit 12 is moot on this record.

In diversity actions, federal district courts consult state law to determine the existence or absence of evidentiary privilege. *See Lee v. Medical Protective Co.*, 858 F.Supp.2d 803, 807 (E.D. Ky. 2012); FED. R. EVID. 501 ("But in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision."). The disputes over Exhibits 10 and 12 turn on whether the lawyer-client privilege shields the communications from disclosure. Kentucky's "lawyer-client privilege" protects confidential communications made "for the purpose of facilitating the rendition of professional legal services." *Haney v. Yates*, 40 S.W.3d 352, 354

(Ky. 2000); KRE 503(b). The privilege protects disclosures "necessary to obtain legal advice which might not have been made absent the privilege" and is "triggered only by a client's request for legal, as contrasted with business, advice." *Lexington Pub. Library v. Clark*, 90 S.W.3d 53, 60 (Ky. 2002). Whether a communication falls within the lawyer-client privilege is a fact-based inquiry that depends on the facts and circumstances surrounding the communication. *Id.* at 59. Eclipse, as the party claiming the privilege, must provide the Court with sufficient information to establish its applicability. *Collins v. Braden*, 384 S.W.3d 154, 164–65 (Ky. 2012). A bare assertion of privilege will not suffice. *See Coneal v. American Commerce Insurance Company*, No. 5:18-CV-00095-TBR-LLK, 2019 WL 4579291, at *5 (W.D. Ky. Sept. 20, 2019) (citing *Stidham v. Clark*, 74 S.W.3d 719, 725 (Ky. 2002)).

Beginning with Exhibit 10, Eclipse argues the email is privileged because it "provides a detailed report regarding a discussion with [a] family member of a resident regarding allegations of abuse and neglect and reports on that interaction to the legal and leadership team for next steps, as directed by in-house and outside attorneys involved in addressing the allegations." *See* DE 64 (Response) at 9.  Most of this factual dressing comes from the brief, not the record.

Outside of Eclipse's bare assertion, nothing in the record indicates that the email chain came into being "for the purpose of facilitating the rendition of professional legal services to the client." KRE 503(b). At the time the emails were sent, Eclipse found itself amidst an internal elder abuse investigation. It is entirely unclear whether, at the time of the investigation, Eclipse contacted in-house and outside counsel for legal advice in carrying out the investigation. Further, it is unclear if either Lingerfelt or Oehler (who both sent emails in the relevant exchange), sent those emails knowing that they were for the purpose of obtaining legal advice, or simply for the purpose of furthering or documenting the elder abuse investigation. The purpose behind the emails

is dispositive in Eclipse's claim of privilege, and it remains Eclipse's burden to demonstrate that the emails were decidedly for the purpose of obtaining legal advice. *See Lexington Pub. Library*, 90 S.W.3d at 61. Though an unpublished opinion, the Kentucky Supreme Court's discussion in *Meadowview Regional Medical Center, LLC v. Wood* is instructive:

> This Court has held that whether the attorney-client privilege applies depends "not on what use was ultimately made of the communication, but on the facts and circumstances under which the communication was made." *Lexington Public Library,* 90 S.W.3d at 59. Furthermore, when a business decision also has legal implications, "the business aspects of the decision are not protected simply because legal considerations are also involved." *Id.* at 60 (internal quotations omitted). In this case, the record indicates that the MEC held the December 21 and 22 meetings not necessarily to prepare for the hospital's legal defense, but rather, to further Meadowview's own investigation regarding Dr. Gunn and his future with the hospital. The minutes to the December 20 MEC meeting, which Meadowview provided to Lang's Estate during discovery, stated that the MEC's strategy in dealing with Dr. Gunn was to "collect information about these cases and make a final recommendation to the Board at their next meeting….
>
> Despite the regulatory, business-oriented nature of the December 21 and 22 meetings, Meadowview argues that because Loving was directed to forward any documentation generated from the hospital's investigation back to counsel, his notes from these meetings are nonetheless privileged. However, even though Loving included these minutes in his investigation log and forwarded the log to the hospital's counsel, the fact remains that the December 21 and 22 meetings were conducted by the MEC first and foremost for the business purpose of furthering the hospital's own investigation, which means the notes from those meetings are not confidential attorney-client communications protected under KRE 503. As noted above, communications made for business decisions are not protected by the attorney-client privilege, even if those decisions also involve legal considerations. *Lexington Pub. Library,* 90 S.W.3d at 60.

No. 2008-SC-000506-MR, 2009 WL 735957, at *3 (Ky. Mar. 19, 2009). Similarly, the Exhibit 10 emails facially were created as a part of Eclipse's ongoing investigation into the elder abuse allegations, as the emails primarily consist of Lingerfelt and Oehler memorializing a meeting between Eclipse and one of the victim's family members addressing the abuse allegations. These business- and administrative-related communications fall outside the scope of Kentucky's lawyer-

client privilege because Eclipse has not shown they were made for the primary purpose of facilitating legal advice. *See Lexington Pub. Library*, 90 S.W.3d at 60.

Indeed, the first exchanges reflect disagreement between Oehler and Lingerfelt over meeting events. The longer Lingerfelt summary memo is a granular report about the meeting and then includes practical follow-up tasks regarding the family member. The documents do not present as facilitative to legal advice, and only the barest of inferences point in that direction. The last page, the April 2021 incident report, seemingly is an Eclipse business record (an empirical checklist) that does not implicate the privilege.

That Eclipse's counsel was cc'd on some of the Exhibit 10 emails does not alone support a finding of privilege. "[B]usiness documents sent to … the corporation's attorneys, do not become privileged automatically." *Lexington Pub. Library*, 90 S.W.3d at 60 (quoting *Simon v. G.D. Searle & Co.*, 816 F.2d 397, 403 (8th Cir. 1987)). Rather, it remains with the party seeking protection to demonstrate that the relevant communication is privileged. *See Collins*, 384 S.W.3d at 164–65. Eclipse has failed in that effort. Thus, the Court **GRANTS** Oehler's motion for leave to file **as it pertains to Exhibit 10**.

As for Exhibit 12, the Court need not reach privilege and waiver questions. Exhibit 12 comprises an email chain between several Eclipse employees documenting the APS investigation of elder abuse, which occurred following Oehler's July 16 report. However, the Court finds that its contents are neither dispositive nor even consequential to the merits of this case. Neither party relies on the information contained in Exhibit 12 to support their case theory and much of the contents can be independently confirmed by referencing other unsealed portions of the record. Plaintiff cited it only for the APS visit dates—facts hardly dependent on Exhibit 12. Finding no

11

compelling justification to further muddy the waters on Exhibit 12, the Court **DENIES as MOOT** Oehler's motion for leave to file **as it pertains to Exhibit 12**.

### b.  Eclipse's Motion for Summary Judgment

The Court now turns to Eclipse's motion for summary judgment.

### i.    Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In determining whether a genuine dispute exists, the Court considers all facts and draws all inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indust. Co., Ltd. v. Zenith Radio Corp*., 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Further, the court may not "weigh evidence [or] determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986). If the moving party satisfies its burden, the burden then shifts to the non-moving party to produce "specific facts" showing a "genuine issue" for trial. *See id.* However, "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, on which that party will bear the burden of proof at trial." *Id.* at 2552.

A fact is "material" if the underlying substantive law identifies the fact as critical. *See Anderson*, 106 S. Ct. at 2510. Then, "[o]nly disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id*. An issue is "genuine" if "there

is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 2511 (citing *First Nat'l Bank of Az. v. Cities Servs. Co*., 88 S. Ct. 1575, 1592 (1968)). Such evidence must be suitable for admission—but not necessarily admissible—into evidence at trial. *See Salt Lick Bancorp v. FDIC*, 187 F. App'x 428, 444–45 (6th Cir. 2006).

Because the Court currently sits in diversity jurisdiction under 28 U.S.C. § 1332, it looks to federal law to resolve procedural issues, and Kentucky law, as the forum state, to resolve substantive ones. *See Hanna v. Plumer*, 85 S. Ct. 1136, 1141 (1965); *Erie R.R. Co. v. Tompkins*, 58 S. Ct. 817, 822 (1938).

### ii.   Oehler's Wrongful Termination Claim[2]

Oehler first alleges that Eclipse wrongfully terminated her employment in violation of Kentucky public policy. She relies on the Kentucky Adult Protection Act (KAPA)[3] and the Kentucky Patient Safety Act (KPSA),[4] which generally require reporting of reasonably suspected elder abuse and known patient safety or quality of care concerns. Oehler links the statutes to her claim by arguing that Eclipse management required her to delay reporting the July 2021 elder abuse discovered at Elmcroft, that the failure to report violated KAPA and KPSA, and that Eclipse ultimately fired her for repeatedly insisting that the incident be reported and for ultimately making relevant, if delayed, reports. *See* DE 60 (Response) at 15–17.

---

[2] Initially, the Court notes a high degree of overlap between this claim and Oehler's retaliation claim. Both claims turn partially on the alleged violation or impediment of a statutory obligation, and partially on the alleged retaliatory reaction to that violation or impediment. Additionally, KRS 446.070's cause of action provides at some level the mechanism by which Oehler asserts both claims. *See Shrout v. The TFE Grp.*, 161 S.W.3d 351, 354 (Ky. Ct. App. 2005) ("Underpinning any cause of action for wrongful discharge is KRS 446.070."); *Pari-Mutuel Clerks' Union of Kentucky, Loc. 541, SEIU, AFL-CIO v. Kentucky Jockey Club*, 551 S.W.2d 801, 803 (Ky. 1977) (recognizing the common law wrongful termination claim, but noting that KRS 446.070 entitled the plaintiff to recovery). To the extent daylight finds its way between these two claims, it is likely limited to remedial issues, rather than substantive ones. The retaliatory theory has the same scaffolding.  For now, however, the Court treats them as distinct.
[3] KRS 209.030.
[4] KRS 216B.165.

Kentucky law generally grants employers wide latitude in their discretionary employment decisions. Under the "terminable at will doctrine," an employer may discharge at-will employees "for good cause, for no cause, or for a cause that some might view as morally indefensible.'" *Clarke v. Amazon.com Serv. LLC*, 699 F.Supp.3d 596, 601 (E.D. Ky. 2023) (quoting *Textile Co. Div. v. Meadows*, 666 S.W.2d 730, 731 (Ky. 1984)).[5] An employer's discretion has limits, though. Under Kentucky common law, an employer that terminates an employee for a reason contrary to public policy may be liable to the terminated employee for wrongful termination. *See Grzyb v. Evans*, 700 S.W.2d 399, 401 (Ky. 1985). Since its inception, Kentucky courts limit the remedy with three constraints: (1) the discharge must be contrary to a fundamental and well-defined public policy as evidenced by existing law; (2) the policy must be evidenced by a constitutional or statutory provision; and (3) the decision of whether the public policy asserted meets these criteria is a question of law for the court to decide, not a question of fact. *Id.* Kentucky state and federal courts have further clarified the scope of the "well-defined" public policy prong, finding three general circumstances where a termination may be actionable: (1) when explicit legislative statements prohibit the discharge; (2) when the employee's failure or refusal to violate a law in the course of employment allegedly prompted the discharge; or (3) when the reason for the discharge was the employee's exercise of a right conferred by well-established legislative enactment. *Clarke*, 699 F.Supp.3d at 600 (citing *Hill v. Kentucky Lottery Corp.*, 327 S.W.3d 412, 422 (Ky. 2010)). Further, the public policy invoked generally must have an "employment-related nexus," meaning that it is "directed at providing statutory protection to the worker in his employment situation." *Greissman v. Rawlings & Assocs., PLLC*, 571 S.W.3d 561, 567 (Ky. 2019).

---

[5] The parties do not dispute that Oehler was an at-will employee. *See* DE 43-4 (Offer Letter).

Eclipse first argues that Oehler cannot base her wrongful termination claim on KAPA or KPSA[6] because neither statute has an employment-related nexus. *See* DE 43 (Memo in Support) at 8–11. *Clarke* deals effectively with this area. In *Clarke*, Chief Judge Reeves found that "[t]he employment-related nexus requirement is inherently satisfied under the second public policy exception because the refusal to violate the law occur[s] 'in the course of employment.'" *Clarke*, 699 F.Supp.3d at 601 (citing *Hill*, 327 S.W.3d at 422). Oehler's wrongful termination theory rests, partly at least, on the second of the three available circumstances: her purported objection to violating the law by delaying reports of elder abuse to the relevant authorities. *See* DE 60 (Response) at 14 ("[T]he evidence shows that Eclipse unlawfully terminated Oehler for failing or refusing to violate KAPA and KPSA[.]"). As such, the purported refusal to violate the law had an employment-related nexus sufficient to support Oehler's wrongful termination claim.

Eclipse next argues that Oehler "lacks standing for any wrongful discharge claim premised on KRS 209.030 because that statute only sets out reporting mechanics, including who should report." *See* DE 43 (Memo in Support) at 11. Essentially, Eclipse argues that Oehler's wrongful termination claim must fail because KAPA and KPSA only establish a duty to report, not affirmative protections for those that follow the statutes' directives.[7] Chief Judge Reeves also dismissed an identical argument in *Clarke*:

> The second part of Amazon's argument is related and can be disposed of in short order. Amazon asserts:
>
>> While [KRS 183.100] has a safety aim, that aim is to protect the *public*, not to protect employees from termination.... "The statute [relied on to support a wrongful discharge claim] must make clear

---

[6] KRS 216B.165(3) offers express statutory protection against retaliation to an employee of a health care facility. The argument has no traction under the combination of this statutory hedge and KRS 446.070's enablement. This is a classic area for wrongful discharge application. *See Foster v. Jennie Stuart Med. Ctr., Inc.*, 435 S.W.3d 629, 635 (Ky. Ct. App. 2013) (finding that plaintiff can satisfy the elements of a wrongful discharge claim by relying on KRS 216B.165(3)'s retaliatory protections).

[7] Again, the argument has no application to KRS 216B.165(3), which expressly protects against any reprisal, restraint, or discrimination as to a reporting employee.

that it intends to protect employees in their employment situation…." *Marshall*, 575 S.W.3d at 656.

If Amazon's contention were true, an employee terminated for refusing to commit theft may not have an actionable wrongful discharge claim because KRS 514.030 (theft by unlawful taking or disposition) is not directed at providing employee protection. The Supreme Court of Kentucky has made clear that discharging an employee for refusal to violate a law is, by itself, "so contrary to public policy as to be actionable as wrongful discharge." *Hill v. Ky. Lottery Corp.*, 327 S.W.3d 412, 422 (Ky. 2010).

699 F.Supp.3d at 603 (internal quotations omitted).

Following *Clarke*'s logic, Oehler need not show that KAPA provides independent protections related to her employment, as a termination based on the refusal or failure to violate the statute is alone sufficient to support her wrongful termination claim. KPSA, alternatively, offers express protection, and Eclipse advocates nothing to avoid the resulting mechanics of that statute here.

With procedure settled, the Court now turns to the merits of Oehler's wrongful termination claim. To succeed on a wrongful termination claim under any of the three circumstances identified in *Clarke*, "a plaintiff must show at a minimum that he was engaged in a statutorily protected activity, that he was discharged, and that there was a connection between the protected activity and the discharge." *Mitchell v. Coldstream Laboratories, Inc.*, 337 S.W.3d 642, 645 (Ky. Ct. App. 2010) (quoting *Follett v. Gateway Regional Health System, Inc.*, 229 S.W.3d 925, 929 (Ky. Ct. App. 2007)) (internal quotations omitted). Importantly here, the final causation prong requires that the plaintiff's protected activity was "a substantial and motivating factor but for which the employee would not have been discharged." *Follett*, 229 S.W.3d at 929 (quoting *First Property Management Corp. v. Zarebidaki*, 867 S.W.2d 185, 188 (Ky. 1993)). The protected activity, however, need not be the exclusive cause for the termination, but simply one that was an essential ingredient in the decision. *Charalambakis v. Asbury Univ.*, 488 S.W.3d 568, 583 (Ky. 2016).

16

In Kentucky, wrongful discharge based on retaliation or discrimination for protected conduct follows a burden-shifting approach inspired by the familiar *McDonnel Douglas* framework. *See Benningfield v. Fields*, 584 S.W.3d 731, 738 (Ky. 2018). Under this framework, Oehler must first sufficiently prove her *prima facie* case of wrongful discharge: (1) protected activity, (2) discharge, and (3) a causal connection between the two. *See Mitchell*, 337 S.W.3d at 645. With a *prima facie* case satisfied, "the burden then shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action." *Benningfield*, 584 S.W.3d at 739 (citations omitted). The burden then shifts back to the employee to demonstrate that the proffered reasons were merely a pretext for retaliation. *See id.*; *Kentucky Dep't of Corr. v. McCullough*, 123 S.W.3d 130, 134 (Ky. 2003). A genuine issue of material fact as to pretext, once reached, precludes summary judgment in the employer's favor. *See Kentucky Dep't of Corr.*, 123 S.W.3d at 143 ("[A] plaintiff's *prima facie* case, combined with sufficient evidence to find that the defendant's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully retaliated against the employee.") (citing *Reeves v. Sanderson Plumbing Prod., Inc.*, 120 S. Ct. 2097, 2109 (2000)); *Bishop v. Manpower, Inc. of Cent. Kentucky*, 211 S.W.3d 71, 77 (Ky. Ct. App. 2006) (reversing grant of summary judgment where genuine issue of material fact concerning pretextual motive existed in employer's termination decision).

Oehler chiefly argues that "[t]emporal proximity establishes the requisite causation in this case."[8] *See* DE 60 (Response) at 19. Kentucky state and federal courts hold that close temporal proximity can serve as a sound circumstantial basis for the causation aspects of a *prima facie* discharge claim. *See Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) ("Where

---

[8] The parties' briefing does not seriously dispute the first two elements of Oehler's claim: that she engaged in protected activity (demanding reporting, internally reporting, then externally reporting) and was terminated. Each a jury could rationally find. They dedicate their arguments almost exclusively to causation issues. Accordingly, the Court focuses its efforts there as well.

an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a *prima facie* case of retaliation."); *Kentucky Dep't of Corr.*, 123 S.W.3d at 135 ("[A] close temporal proximity alone may be sufficient to raise the inference [of retaliation]."). Indeed, the Supreme Court of Kentucky identifies a logically scaled relationship between the time separating the protected conduct and the adverse employment decision for purposes of inferring cause in a wrongful discharge claim: the shorter the gap between the protected activity and the termination, the more likely the termination related to the protected activity. *Kentucky Dep't of Corr.*, 123 S.W.3d at 135 ("The sooner adverse action is taken after the protected activity, the stronger the implication that the protected activity caused the adverse action, particularly if no legitimate reason for the adverse action is evident."). Reasonable inferences and friendly perceptions, as always, must favor the nonmovant.

Temporal proximity strongly supports Oehler's causation theory. Less than two weeks separated Oehler's invocation of her KPSA and KAPA reporting requirements, her eventual report, and her termination. The first operative event occurred in early July 2021 when allegations of elder abuse arose in Eclipse's memory care unit. *See* DE 52 at 25–27, 38–40. After Oehler returned from vacation, specifically on July 13, she received reports of the alleged misconduct from her staff and immediately forwarded the allegations to Lingerfelt. *See* DE 52 at 33. It was then that she first insisted on reporting the allegations to authorities, but was told to "hold off," pending an investigation and discussion amongst Eclipse leadership. *Id.* at 26, 28, 35. Oehler then began investigating the alleged abuse on July 14, leading her to suspend Memory Care Unit Director Manley and others involved. *Id.* at 36, 152. Oehler continued to raise the reporting obligation to Eclipse management, but to no avail. *See* DE 52 at 30. It was not until July 16 that Eclipse approved

Oehler's investigation report and granted her permission to report the abuse to authorities. *See* DE 12 at ¶ 25. She promptly did so. DE 52 at 25–27, 85–87. Elmcroft then suspended Oehler on July 25, just nine days after she reported the elder abuse and twelve days after she first flagged her and Eclipse's statutory reporting obligations. *See* DE 52 at 105–06. Lingerfelt terminated her three days after the sudden suspension. *Id.*; DE 43 at 7.

This truncated timeline between Oehler's reporting and her termination raises a significant inference of causal connection. By all objective accounts, Oehler was a model employee in Eclipse's eyes up to the twelve-day period that ended in her suspension and termination. Just four months prior, she received a positive performance review, along with a bonus for her efforts, and there was no sign of consternation between her and Eclipse senior management. *See* DE 52 (Oehler Depo) at 95; DE 53 (Lingerfelt Depo) at 21–22 (working relationship with Oehler was "good" and her performance during the first year as Executive Director was "solid"). That is, until the relationship soured between July 13 and July 25.

At the *prima facie* stage, the Court need only ask whether a reasonable jury could draw the temporal link between Oehler's protected activity and her termination. *Anderson*, 106 S. Ct. at 2511. Presented with an employee approbated by her supervisors until just 12 days after raising an elder abuse reporting requirement, and given Eclipse's reporting constraints, the timeline alone could permit a reasonable jury to find that Eclipse's termination resulted from Oehler's protected activity. The cases well-support the inferential linkage. *See Mickey*, 516 F.3d at 525; *Kentucky Dep't of Corr.*, 123 S.W.3d at 135; *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) (three-month time gap between protected activity and termination sufficient to establish temporal proximity); *Carter v. Lexington-Fayette Urb. Cnty. Gov't*, No. 2018-CA-1818-MR, 2022

19

WL 17724562, at *25 (Ky. Ct. App. Dec. 16, 2022) (accord). At summary judgment, Oehler need not go further.

Eclipse responds that intervening events break the temporal link in Oehler's causation theory and establish a legitimate basis for Oehler's termination. It cites or has cited Oehler's reporting to work on July 19, despite exhibiting symptoms of COVID-19, *see* DE 52 (Oehler Depo) at 62–64, her May 2021 suspension of COVID screening policies, discovered by Lingerfelt on July 19, *see* DE 60 (Response) at 5–6, and Oehler's disclosure of an internal investigation report to a resident's family member on July 22, *see* DE 53 (Lingerfelt Depo) at 74–76; *see also* DE 43-19 (Lingerfelt Email). While these interspersed events may well prove persuasive to a jury, they do not foreclose Oehler's *prima facie* claim. *See Bullard v. Alcan Aluminum Corp.*, 113 F. App'x 684, 691 (6th Cir. 2004) (whether an employee's protected activity motivated an employer's discharge is a fact issue for the jury); *Willoughby v. GenCorp, Inc.*, 809 S.W.2d 858, 861 (Ky. Ct. App. 1990) (holding that the presence of a legitimate reason for termination does not preclude a reasonable jury from determining that the purported reason was a pretext for other impermissible termination justifications).

The competing causal theory is one a jury must assess. Lingerfelt's sudden displeasure with Oehler's screening decision gives reason to pause. Oehler swears that Lingerfelt entered the building without any screening on July 13. She had suspended screening months prior. He said nothing to her about the lack of screening. He only raised the Go Canvas decision *after* the abuse allegations surfaced and Oehler championed the duty to report. The sequencing supports, in one view, that Eclipse seized on the screening management by Oehler only as a post-hoc justification for a job action actually grounded in illegal animus. Lingerfelt's testimony concedes he would have raised the issue sooner if he had not been screened and viewed the issue as significant. *See*

DE 53 (Lingerfelt Depo) at 53 (affirming in response to a question that it would have been "reasonable to assume" that if he was not screened and thought he should have been, that he would have raised the issue with Oehler). *See Dollar Gen. Partners v. Upchurch*, 214 S.W.3d 910, 917 (Ky. Ct. App. 2006) (reversing grant of directed verdict on a retaliation claim where facts suggested that gathering of evidence against employee was motivated by a need to find a legally permissible reason to terminate).

A few additional points: Eclipse's main causal attack is comparative, that Oehler, Lingerfelt, and maybe even Hehn had all made prior reports and yet got hired or were retained by Eclipse. First, that is a classic jury argument hinging on counter-inference. Second, the record cited by Eclipse—DE 43-26; 43-8—hardly supports the propositions as factually dispositive.

Further, to some degree, Eclipse argues about whether Oehler's information rose to reportable status. Juries in Kentucky typically sort questions of reasonableness. § 216B.165 duties ripen on "reasonable cause to believe" there exists safety or quality of care jeopardy. § 209.030 duties mature on "reasonable cause to suspect" adult abuse, and the statute requires immediate reporting "upon knowledge of suspected abuse." § 209.030(3). Given Oehler's documented history with the memory care director, her prior advocacy for termination, and the information provided on July 13, a jury surely could find the low threshold met. If Oehler knew enough to warrant immediate suspension of the involved employees, a move Eclipse apparently does not criticize, a jury could treat her as having "knowledge of suspected abuse" and "reasonable cause to suspect" a reportable circumstance.

Eclipse's pretext argument is thin enough, and much of the causal observations flow through to the pretext analysis. The Court sees a jury question on the validity of Eclipse's claimed basis for termination. *See Charalambakis*, 488 S.W.3d at 578 (discussing modes of pretext proof

and noting plaintiff's ultimate task to produce sufficient evidence from which the jury could reasonably reject the employer's explanation and find it to mask discriminatory motive). Again, merely giving Oehler the lens Rule 56 requires, the following observations pertain.

Lingerfelt was the decisionmaker. The contradictory and inconsistent justifications Lingerfelt offered for Oehler's termination support an inference of pretextual intent. He avers now that one single thing led to the discharge, "specifically" Oehler's decision that "stopped entry screening at the Florence, Kentucky, community[.]" DE 43-8 at ¶ 3. This sharply contrasts with other sworn instances. Lingerfelt also testified that Oehler's decision was not in fact the reason, "I don't think she was necessarily fired for stopped [sic] doing COVID screenings." DE 53 at 53. He also has sworn the firing resulted from multiple factors, contrary to the single basis now offered. *See id.* at 69–70 ("It wasn't one specific thing[.]"). Eclipse, in litigation, blamed Oehler's disclosure of an unrelated incident document, *see* DE 60-2 at 5,[9] but Lingerfelt, the decider, did not rest on that matter. *See* DE 53 at 80–81 ("it wasn't that she went against me, by any means, that was not the reason in any way, shape or form"); DE 43-8 (Lingerfelt Declaration) (putting no reliance on disclosure issue). And again, Oehler's "dangerous" decision on screening plausibly became known to Lingerfelt on July 13, when, pre-abuse allegations, he made utterly no mention of or comment on Oehler's handling. Further, the screening change made by Oehler had been in effect for months, and yet Eclipse had no negative reaction until the July events boiled over.

Finally, the Vaughn version and role also matter. She, an HR supervisor, had resisted Oehler's prior efforts to fire Manley, and Vaughn even continued to oppose termination of Manley

---

[9] Per Eclipse, "Defendant terminated Plaintiff[] because . . . she contradicted senior management and shared a confidential incident report outside the community." DE 60-2 at 5. Thus, the honest belief defense—on which Eclipse partially relies on in its briefing—finds no application here. *See HBR Madisonville, LLC v. Attebury*, No. 2019-CA-1397-MR, 2021 WL 1583837, at *9 (Ky. Ct. App. Apr. 23, 2021) (The defense holds that "as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual by showing it was ultimately incorrect."). Seeing as Eclipse and Lingerfelt directly contradict the other, the defense can hardly invoke this doctrine as a dispositive basis.

after the abuse allegations. *See* DE 53-6 at 1–2. When it came to Oehler's termination, Vaughn was someone Lingerfelt consulted. *See* DE 53 at 68, 85.   Further, she participated in the termination.  *See* DE 54 at 19. She insisted Eclipse fired Oehler because of her involvement in or knowledge of the abuse allegations. *See id*. at 54–55. This is telling in several ways. First, it contradicts Eclipse's and Lingerfelt's single stated reason and thus the factual basis for summary judgment. Second, it directly connects Oehler's abuse allegation knowledge to the discharge. In one viewing, this is parallel to Plaintiff's liability theory. Nothing suggests Oehler *participated* in the abuse; indeed, she was on vacation for most of it. Oehler strongly reacted to the allegations, immediately suspending employees, advocating for reporting, and advocating for Manley's discharge. If the HR rep ties Oehler's termination to her "involvement" or what she "knew" or had "supervision" over, given what Oehler actually did, this is plausible proof of retaliation and of pretext.[10]

As with causation, a short temporal gap is indicative of pretext. Although temporal proximity alone will not suffice, suspicious timing plus other pretext proof creates a jury question. That is where this case lands. *See Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012) ("However, suspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence.") (internal quotations omitted); *Asmo v. Keane, Inc.*, 471 F.3d 588, 598 (6th Cir. 2006) (noting that temporal proximity, combined with other evidence, "can be used a[s] indirect evidence" to support a pretext claim). The jury must assess the legality of Oehler's firing in a thicket of conflicting and contradictory proof.  The decision may certainly have been lawful, but there is a genuine dispute of material fact that warrants trial.

---

[10] Again, the honest-belief doctrine does not decide this case.  Lingerfelt was the sole decisionmaker, and there are factual questions about his reasoning, the solidity of the decisional basis, and his own views on how (and whether) COVID screening impacted the firing.

### iii.   Oehler's Age Discrimination Claim

Eclipse next moves for summary judgment on Oehler's age discrimination claim. *See* DE 43 at 13–17. Oehler relies on the Kentucky Civil Rights Act ("KCRA"), *see* DE 12 (Amended Complaint) at 7, which prohibits an employer from discharging or discriminating against an employee "because of the individual's age." KRS 344.040(1). Claims brought under the KCRA are "analyzed in the same manner" as federal ADEA claims, and the Court may therefore draw from Kentucky cases interpreting the KCRA and federal cases interpreting the ADEA. *See Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 393 (6th Cir. 2008); *see also Harker v. Federal Land Bank of Louisville*, 679 S.W.2d 226, 229 (Ky. 1984) ("The Kentucky age discrimination statute is specially modeled after the Federal law. Consequently, in this particular area we must consider the way the Federal Act has been interpreted.").

A plaintiff bringing an age-discrimination claim based on a disparate-treatment theory must prove that age was a "determining factor" in the relevant adverse employment action. *Allen*, 545 F.3d at 394 (quoting *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1023 (6th Cir. 1993)). Under both state and federal law, it is not enough that age was one factor among many; rather, the plaintiff must show that age had a "determinative influence" on the challenged outcome. *Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2350 (2009).

A plaintiff can establish a KCRA age discrimination claim either through direct or circumstantial evidence. *Back v. Nestle USA, Inc.*, 694 F.3d 571, 576 (6th Cir. 2012). But when a plaintiff relies on circumstantial evidence—as Oehler does—the *McDonnell Douglas* burden-shifting framework applies. *Id.* Under that framework, an employee must show that (1) she is a member of a protected class, (2) she suffered an adverse employment action, (3) she was qualified for the position held, and (4) that she was either replaced by or treated less favorably than someone

outside the protected class. *See Tuttle v. Metro. Gov't of Nashville,* 474 F.3d 307, 317 (6th Cir. 2007). If the employee satisfies these four *prima facie* elements, then "the burden of production shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse employment action." *Schoonmaker v. Spartan Graphics Leasing, LLC,* 595 F.3d 261, 264 (6th Cir. 2010). If the employer properly complies, the employee must then show that the employer's stated reasons were mere pretext. *Id.* During this time, however, the burden remains on the employee to show that age was the but-for cause of the adverse employment action. *Id.* (citing *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009)). And in any event, if the employee fails outright to establish a *prima facie* case, then the Court need not go further.

One further wrinkle also applies to Oehler's claim. In age discrimination cases, the replacement requirement is modified to "require replacement not by a person outside of the protected class, but merely replacement by a significantly younger person." *Smith v. Walle Corp.*, 62 F.Supp.3d 587, 595 (E.D. Ky. 2014) (quoting *Grosjean v. First Energy Corp.*, 349 F.3d 332, 335 (6th Cir. 2003)). Thus, the ultimate inquiry on the final prong becomes whether Oehler was replaced by or treated differently from a "significantly younger person."

Eclipse argues that Oehler's claim fails at the *prima facie* stage because she was neither qualified for her position, nor replaced by or treated less favorably than a significantly younger employee. *See* DE 43 (Memo in Support) at 14. Eclipse first argues that Oehler was not qualified for her position as Executive Director because she made the "dangerous decision" to remove the Go Canvas COVID-19 screening requirement and attended work in-person despite exhibiting symptoms of COVID-19. *See id.* at 13–14.

Eclipse's first argument fails; Oehler was undoubtedly qualified for her position. In August 2018, she was promoted to Executive Director. DE 60 (Response) at 2. Throughout her tenure, she

received satisfactory performance reviews up until the events at issue in this case. *See* DE 43 (Memo in Support) at 2. This included a positive review and bonus in March 2021.  While she was placed on one performance improvement plan around six months after beginning her new position as Executive Director, *see* DE 43-7, this is the only documented disciplinary action taken against her aside from the events challenge here. All other evidence—including that offered by Eclipse—demonstrates that her tenure was satisfactory. *See* DE 53 at 21–22 (working relationship with Oehler was "good" and her performance during the first year as Executive Director was "solid"). Eclipse blamed the full firing on events in July 2021; a qualified employee does not lose qualification because of an employer's proffered firing grounds. That would collapse the full merits into the *prima facie* elements, something the Court rejects.

Having satisfied the first three elements of her *prima facie* age discrimination claim,[11] the ultimate question becomes whether Eclipse replaced Oehler with someone significantly younger.[12] *See Smith*, 62 F.Supp.3d at 595. If properly demonstrated, Oehler's significantly younger replacement raises an inference that the termination related to age in some legally meaningful way. *See Norton Healthcare, Inc. v. Disselkamp*, 600 S.W.3d 696, 716 (Ky. 2020).

To substantiate the final element in her *prima facie* case, Oehler points to her initial (temporary) replacement by Lingerfelt, followed by her permanent replacement by Christine Hehn. Lingerfelt's temporary replacement is irrelevant, as it is well-settled that "an employee's assumption of a terminated co-worker's job duties does not constitute replacement for purposes of a [KCRA] claim." *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283–84 (6th Cir. 2012); *see also*

---

[11] Eclipse does not challenge the first two prongs of Oehler's claim: that she was a member of a protected class (those over the age of 40) and that she suffered an adverse employment action (termination).

[12] Oehler does not argue that there was less-favorable treatment, so the Court will only focus on the replacement aspect of the fourth element. *See* DE 60 (Response) at 24 ("Similarly, evidence that she was replaced by a significantly younger person establishes the fourth *prima facie* element.").

*Geiger*, 579 F.3d at 623; *Schoonmaker*, 595 F.3d at 265. Rather, a person is replaced "only when another employee is hired or reassigned to perform the plaintiff's duties," not when "another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work." *Schoonmaker*, 595 F.3d at 265. Lingerfelt merely assumed Oehler's role until Eclipse hired a permanent replacement following a traditional job search. *See* DE 43-22 (Lingerfelt Letter) ("I'll [Lingerfelt] be stepping in as acting Executive Director until we recruit a new Executive Director to serve you…. This process usually takes about 6-8 weeks and we're supported by our company HR and Recruitment teams in our efforts."). Thus, the relevant hire is when Hehn permanently assumed the Executive Director role.

Oehler contends that Hehn is "significantly younger" than she, DE 60 (Response) at 24, but fails to identify any concrete support for the assertion. The only evidence concerning Hehn's age is Lingerfelt's deposition testimony, where he estimates—says he's "guessing"—that Hehn was in her "early 50s maybe" when she was hired. *See* DE 53 (Lingerfelt Depo) at 102, Lines 14–16. While Kentucky state and federal courts have been less than precise in contouring the "significantly younger" requirement, the Sixth Circuit abides by a "general consensus" that age differences of less than 10 years are not significant enough to satisfy the fourth prong of a *prima facie* age discrimination case. *See Grosjean*, 349 F.3d at 338. Though early 50s might make Hehn "significantly younger," Lingerfelt was merely "guessing" at her age. *See* DE 53 (Lingerfelt Depo) at 102 ("Guessing, early 50s maybe" when asked about Hehn's age). This uncertainty is important because if, for example, Hehn was between 50–53 years of age when Eclipse hired her, she would likely be "significantly younger" than Oehler under *Grosjean*, but if she is just two to three years

27

older, the calculus becomes far less certain. A federal case should not turn on guesswork, particularly as to an objective and knowable fact.

Importantly, even at summary judgment, it is Oehler's burden to identify sufficient evidence that could lead a reasonable jury to conclude that Hehn was "significantly younger" than her at the time Eclipse hired Hehn. *Schoonmaker*, 595 F.3d at 264; *Grubb v. YSK Corp.*, 401 F. App'x 104, 114 (6th Cir. 2010) (finding that the district court properly granted summary judgment on an age discrimination claim against a plaintiff who failed to offer specific evidence of the replacement employee's age or other evidence of but-for age discrimination). While the Court must read the record in Oehler's favor, she may not resort only to "speculation, conjecture, or fantasy" to establish the elements of her claim; summary judgment practice requires more. *See K.V.G. Properties, Inc. v. Westfield Ins. Co.*, 900 F.3d 818, 823 (6th Cir. 2018).   The Court would not let a witness guess on the stand, and a guess is all Plaintiff here can offer on this claim aspect.

Because the record lacks sufficient evidence to create a genuine dispute of material fact as to whether Hehn was "significantly younger" than Oehler when hired as Executive Director, the Court grants summary judgment in Eclipse's favor on the age claim.

### iv. Oehler's Retaliation Claim

Oehler's final claim relies on KRS 446.070. The statute provides that any person injured by the violation of a statute may recover damages sustained from the violation. *Id.* While the cause of action is often used in the context of a negligence *per se* theory of recovery, plaintiffs have also successfully used it as a vehicle for wrongful termination and retaliation claims. *See generally Macglashan v. ABS Lincs KY, Inc.*, 448 S.W.3d 792 (Ky. 2014) (finding that a healthcare employee covered by whistleblower protections could recover front pay under 446.070 for employer's

28

retaliation for protected reporting). As with Count 1, KAPA and KPSA provide the core for 446.070 application.

Eclipse again turns to procedure. It first argues that Oehler cannot maintain both her common law wrongful termination claim and statutory retaliation claim because the claims are materially the same and thus duplicative. *See* DE 43 (Memo in Support) at 17–18. This argument stands on unsteady ground. Eclipse does not cite any support for this argument, and the Court cannot find any. Moreover, persuasive authority appears to directly contradict it. Facing a similar posture, the Western District of Kentucky permitted a plaintiff's complaint for common law wrongful termination *and* retaliation, both based on KRS 216B.165. *MacGlash v. ABS Lincs KY, Inc.*, 84 F.Supp.3d 595, 601–02 (W.D. Ky. 2015). The Court held that in some instances, a statutory retaliation claim may preempt a common law wrongful termination claim, but only where the statute relied on creates a cause of action or a remedial scheme for its violation. *See id.* (citing *Hill v. Ky. Lottery Corp.,* 327 S.W.3d 412, 421 (Ky.2010)). In that instance, the statute preempts the public policy wrongful discharge claim because the statute itself provides the applicable remedy. Because KRS 216B.165 lacked a cause of action or a remedy for its violation, the plaintiff's wrongful termination claim was not preempted by his statutory retaliation claim. *See id.*

The same applies here. Neither KAPA nor KPSA provides a cause of action or an express remedy for their violations. Thus, without an express statutory cause of action or a remedy from the foundational statutes, Oehler's statutory claim under 446.070 does not preempt her common law wrongful termination claim, regardless of either claim's success on the merits.

Turning to the merits, Eclipse again stumbles. A *prima facie* unlawful retaliation claim requires the plaintiff to establish "(1) she engaged in a protected activity, (2) she was disadvantaged by an act of her employer, and (3) there was a causal connection between the activity engaged in

and the [defendant] employer's act." *Kentucky Dept. of Corrections v. McCullough*, 123 S.W.3d 130, 133–34 (Ky. 2003) (quoting *Kentucky Center for the Arts v. Handley*, 827 S.W.2d 697, 701 (1991)). In the absence of direct evidence of retaliation, the Court follows the *McDonnell Douglas* burden-shifting framework. *See id*. at 134.

On Oehler's final claim, Eclipse argues that Oehler was not a whistleblower, so she is not protected by KRS 216B.165, similarly, that KRS 209.030 cannot support the claim because it is only a reporting statute and is thus non-protective to Oehler, and finally that its same arguments supporting summary judgment on Oehler's wrongful termination claim compel the same result here. *See* DE 43 (Memo in Support) at 17–19. Each of these arguments fails.

Eclipse's first argument falters in the plain language of KRS 216B.165. In addition to the reporting requirements discussed previously, KRS 216B.165 expressly prohibits retaliatory activity taken by an employer in response to any employee's reporting under the statute. *See* 216B.165(3) ("No healthcare facility or service licensed under this chapter shall … discriminate against any agent or employee who in good faith reports, discloses, [or] divulges … the circumstances or facts to form the basis of a report under subsections (1) or (2) of this section."). Further, the statute prohibits any employer conduct that would "discourage, restrain, suppress, dissuade, deter, prevent, interfere with, [or] coerce…" reporting under the statute. *Id.* Thus, Eclipse plausibly violated this statute in various ways. As discussed, a reasonable jury could conclude that temporal proximity, combined with Lingerfelt's and Vaughn's directly contradictory testimony, establish indirect evidence of causation and pretext concerning Oehler's treatment. Likewise, even if the jury does not get that far, it could still conclude that Lingerfelt's "hold off" order was meant to (and did) "discourage, restrain, suppress, [or] dissuade" Oehler's report.

30

As an aside, Eclipse contends that Oehler was not a whistleblower and was therefore not covered by any violation of the statute. *See* DE 43 (Memo in Support) at 18. This argument fails. Oehler did in fact report the elder abuse/care quality concerns to authorities, even if it was after Lingerfelt lifted the "hold off" order on July 16. *See* DE 52 (Oehler Depo) at 26. Oehler's status as a "whistleblower" under 216B.165 does not depend on an employer's approval to file the report; it matters only that she filed the report at all. *See* KRS 216B.165(1) (Any agent or employee of a healthcare facility with reasonable cause to believe a patient's safety or quality of care is in jeopardy "may make [the report] to any appropriate private, public, state, or federal agency."). Further, an employer may not require prior notice in advance of an employee's report. § 216B.165(3).  As a result, Eclipse's invocation of *Foster v. Jennie Stuart Med. Ctr., Inc.*, 435 S.W.3d 629 (Ky. App. 2013), which held that KRS 216B.165 protects only those that report under the statute, adds nothing of value to its argument. Oehler reported, so she is protected.

Eclipse similarly argues that Oehler cannot base her statutory retaliation claim on KRS 209.030 because the statute only provides immunity for making reports, not job or other protections for those that report. *See* DE 43 (Memo in Support) at 18–19. This reasoning fares no better. While true that 209.030 lacks the same express retaliation and dissuasion provisions of 216B.165, 209.030 contains two added, and equally important, caveats to its dictates. Section 209.030 requires "immediate" reporting upon knowledge of suspected abuse, neglect, or exploitation of an adult. KRS 209.030(3). Likewise, the statute *requires* reporting, rather than merely permitting it. KRS 209.030(4) ("An oral or written report shall be made…."). The immediacy and mandatory qualifications establish the protected activity that could serve as a basis for a reasonable jury's finding of retaliatory intent. Recall that Oehler need only show at the *prima facie* stage that she engaged in protected activity, suffered an adverse employment action, and the

protected activity caused the adverse employment action. *Kentucky Dept. of Corr.*, 123 S.W.3d at 133–34. As one plausible reading of the record: Oehler engaged in protected activity by invoking, pressing, and following through on her statutory reporting requirements, encountering delay and impediments from Eclipse; she suffered an adverse employment action at Eclipse's hands, and sufficient evidence exists for a reasonable jury to draw a causal link between the protected activity and the termination. Thus, 209.030's lack of affirmative protections does not foreclose Oehler's reliance on the statute to support her retaliation claim under 446.070. Eclipse arguably violated the immediacy and mandatory aspects, and those violations arguably inflicted harm on Oehler.

Finally, as to summarily cross-referenced arguments that really apply to both Counts 1 & 3, the Court in turn merely alludes to its prior analyses. The Court **DENIES** summary judgment on Oehler's retaliation claim.

### c.   Damages Issues

Finally, Eclipse brings two arguments relating to damages. The Court considers each in turn.

### i.   Eclipse's Termination of Operations at Elmcroft

Eclipse first argues that if the Court allows some or all of Oehler's claims past summary judgment, the Court should suspend Oehler's damages after Eclipse ended its operations at Elmcroft of Florence. *See* DE 43 (Memo in Support) at 19–20. In October 2021, just months after Oehler's termination, Eclipse terminated its operations at Elmcroft and, in essence, ceased to exist. *See* DE 43-24 (Secretary of State Filing). As part of that process, Eclipse terminated its employment relationships with all Elmcroft employees, requiring them to reapply for employment, if sought, with the incoming and distinct management company. *See* DE 43-8 (Lingerfelt Declarations) at 3–4. This included Oehler's replacement, Hehn, who was terminated less than two

months after taking the helm at Elmcroft. From this, Eclipse concludes that any damages claimed by Oehler must necessarily end when Eclipse terminated its employment relationships with all other Elmcroft employees. It asks the Court to grant summary judgment to that effect. *See* DE 43 (Memo in Support) at 20.

Eclipse cites no authoritative law for this proposition, but the Court nonetheless finds that it has intuitive appeal. Because Eclipse does not adequately support the request, granting summary judgment on the issue is not warranted. However, the Court finds that denying the request outright would be similarly premature. It seems instinctive that once an employer truly shutters its doors, damages for a prior employment action, to the extent tethered to ongoing employment, would end. Tomorrow is promised to no one. The Court **DEFERS** this issue until trial, at which point it is inclined to impose a remedial restraint to this effect after giving both parties sufficient opportunity to address the issue.

### ii.    Emotional Distress Damages

Next, Eclipse argues that if any of Oehler's claims surpass summary judgment, that the Court should grant summary judgment in Eclipse's favor on emotional distress damages. It provides two reasons why: first, that emotional distress damages require an expert when multiple competing circumstances may have caused the damages, and second, that Kentucky law has incorrectly read the KCRA to allow for emotional distress damages, which the Court should end here. DE 43 (Memo in Support) at 20–25.

The Court rejects these arguments.  Kentucky requires expert proof as to emotional distress only in defined circumstances. Thus, "*Osborne*'s requirement of expert medical or scientific proof is limited to claims of intentional or negligent infliction of emotional distress." *Indiana Insurance Co. v. Demetre*, 527 S.W.3d 12, 39 (Ky. 2017) (referencing in the discussion other statutory

theories, including the KCRA, distinct from standalone IIED and NIED scenarios). A jury can, if it reaches that juncture, use its common sense to sort among the factors and vagaries of life that may have impacted Oehler pertinent to the claim period. Further, given the KCRA ruling, Eclipse's argument particular to Chapter 344 damages, though counter-legal under Kentucky law, also is moot.

## III.   Conclusion

Accordingly, the Court **GRANTS** Eclipse's motion for summary judgment on Oehler's age discrimination claim and **DENIES** its motion on Oehler's wrongful termination and retaliation claims.

The Court also **GRANTS** Oehler's related motion for leave, **as to Exhibit 10**, but **DENIES** it as **MOOT as to Exhibit 12**, *see* DE 50. The Court **DIRECTS** the Clerk to **UNSEAL** DE 61-1.

This the 23rd day of September, 2024.

Signed By:

_Robert E. Wier_

**United States District Judge**